**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AJIRA AI LLC, an Illinois limited liability company, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br>    *v.* <br><br> JPMORGAN CHASE BANK, N.A., an Ohio corporation, <br><br>       *Defendants*. | Case No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ajira AI LLC ("Ajira AI" or "Plaintiff") individually and on behalf of all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendant JPMorgan Chase Bank, N.A ("Chase"). Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief.

## INTRODUCTION

1.      In March 2020, facing eviscerated marketplaces and shuttered businesses across virtually all sectors, Congress created a program to distribute money to small businesses like Plaintiff on a first-come, first-served basis.

2.      Congress' plan to aid small businesses was enacted on March 27, 2020. The Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") authorized up to $349 billion in forgivable loans to small businesses to cover payroll and other expenses.

3.      Defendant Chase, however, saw an opportunity to help its established and better-heeled clients. As the federal government was ramping up to allow small businesses to apply for

PPP loans, Chase decided to ensure its favored clients would be given special assistance to make sure their loan applications were submitted without a hitch.

4.      Plaintiff is a small Illinois-based technology company without the clout and resources of Chase's favored clients. Due to Chase's prioritizing of its favored customers over Plaintiff—and countless businesses like it—Plaintiff was impeded in applying for a PPP loan through Chase, and ultimately, received no loan when Chase failed to accurately review his documentation.

5.      As a result, Plaintiff is now in dire financial straits.

6.      Despite knowing its tactics would inevitably leave many businesses' applications unprocessed, Chase concealed its practices from Plaintiff. It did so knowingly, out of a combination of elite favoritism and, to be sure, at least some additional profit.

7.      As such, Plaintiff brings this Class Action Complaint in order to vindicate its rights, and those of small businesses everywhere who are similarly situated, and to hold Defendant accountable.

**PARTIES**

8.      Plaintiff Ajira AI is a limited liability company formed under the laws of the State of Illinois, with its principal place of business in Illinois, and whose management resides in Illinois. Three out of four of Ajira AI's our members are citizens of Illinois, while the fourth is a citizen of Indiana. Thus, Ajira AI is a citizen of Illinois and Indiana.

9.      Defendant JPMorgan Chase Bank, N.A., is a company and subsidiary of JPMorgan Chase & Co., with its principal place of business located at 1111 Polaris Parkway, Columbus, Ohio 43240. Chase conducts substantial business throughout this District and the State of Illinois, and throughout the United States.

2

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C.

§ 1332(d)(2) because, as to all proposed Classes and Subclasses, (a) at least one member of the

Class, which consists of at least 100 members, is a citizen of a different state than Defendant, (b)

the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of

the exceptions under that subsection apply to this action.

11.     This Court has personal jurisdiction over Defendant Chase because it conducts

significant business in this State, including establishing consumer and business contracts here,

because a substantial amount of the conduct giving rise to this action occurred in this State, and

because Defendant Chase withheld material information from Plaintiff (and other entities in this

State) when it had a duty to speak.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated

from this District.

## FACTUAL BACKGROUND

## I.     Congress Establishes the PPP to Quickly Provide Struggling Businesses a Lifeline.

13.     On March 11, 2020, the COVID-19 outbreak—which had first been identified

several months prior—was designated as a pandemic by the World Health Organization (WHO).

President Trump followed suit on March 13, 2020, declaring the pandemic of sufficient severity

to warrant an emergency declaration for all States, territories, and the District of Columbia.

14.     Shortly thereafter, Governors from states across the nation began to publicly

announce an escalating series of various "stay at home" orders that limited public gatherings,

deemed certain business sectors "essential," mandated the partial or complete closure of normal

3

business operations for businesses not deemed "essential," and placed stringent requirements on many businesses deemed "essential" in order for them to continue operating.

15.     This economic fallout from COVID-19, and the national response to it, was immediate and enormous. Countless businesses in "stay at home" order states across the nation were forced by law to overhaul their business models, scale back their business dramatically, or shutter—either temporarily or permanently. Foot traffic in all businesses also took a sharp downturn as the public began to avoid public spaces of all types, further harming businesses' ability to stay afloat. Furloughs and layoffs were rampant in the private sector. Unemployment insurance filings reached record levels. The major stock indices plummeted, erasing trillions of dollars in shareholder value and retirement accounts.

16.     The federal government faced overwhelming public pressure to respond to this national economic disaster, with the knowledge that time was of the essence to prevent further disruption and destruction—particularly among small businesses. As such, on March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") into law.

17.     To say this legislation was unprecedented is, frankly, an understatement. Amounting to approximately $2 trillion, it is the single-largest economic stimulus bill in American history, underscoring the scope of the threat Congress believed it was facing—and the importance of dramatic, immediate action to put money in the pockets of people and businesses.

18.     Critically, the CARES Act created a $349 billion loan program for businesses with fewer than five hundred employees: the PPP. The goal of the PPP was to provide American

small businesses with eight weeks' worth of funds to assist in covering payroll, rent, and benefits, through fully federally guaranteed loans administered by the SBA.[1]

19.     Really, PPP loans operate more like grants if the recipient is able to follow certain rules, including that at least 75 percent of the loan goes toward payroll, and that salaries and wages of employees making under $100,000 in the past year are not decreased more than 25 percent.[2] Businesses that follow these rules are permitted to submit a request to their SBA lender servicing the loan for total forgiveness—otherwise, the loan matures in two years and carries a 1 percent interest rate.[3]

20.     The SBA was charged with creating the PPP implementing regulations. It issued the first interim final rule ("Initial Rule") on April 2, 2020, and the window for businesses to begin applying for PPP loans was to open with all SBA-affiliated lenders on April 3, 2020.

21.     A key piece of the PPP was that applications be opened and funds be distributed on a "first-come, first-served" basis—that is, SBA's was to process applications and distribute funds based on the order in which they were received.[4] This made the SBA's list of approved lenders key gatekeepers in this process, by extension, as they certainly understood. Because the PPP was to be administered *only* through SBA-approved lenders, and because applicants could *only* access funds from the single pot of $349 billion allocated for the program (unless it was replenished), applying for a loan through an SBA-approved lender quickly and properly would

---

[1]     Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245–AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020).

[2]     85 Fed. Reg. 20812 § e; *id.* at 20813 § (2)(o).

[3]     *Id.* at 20813 § (2)(j).

[4]     *Id.* at 20813 § (2)(m); *see also* https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf.

be critical, and the lenders would have to play a role in ensuring that applications were fairly processed in the order that they were received, to the extent feasible.[5]

22.     The PPP contains other limitations, as well. For instance, each business applicant may only receive one loan through the PPP. Thus, "if you apply for a PPP loan you should consider applying for the maximum amount," per the Final Interim Rule.[6] This strongly incentivized applicants to do precisely this, and to put their hopes in being awarded their full loan request before the PPP loan fund ran dry.

23.     Knowing that SBA-affiliated lenders would face a crush of applications for PPP loans, Congress added a juicy carrot to the stick: for each loan processed and approved, the bank would receive an origination fee of 5 percent on loans up to $350,000; 3 percent on loans between $350,000 and $2 million; and 1 percent on loans between $2 million and $10 million.[7]

## II.     Chase Works Behind the Scenes to Protect Its Friends and Pad its Profits.

24.     Chase is an SBA-affiliated lender authorized to process loan requests for the PPP. It is a highly sophisticated entity with a 220 year-long history, over 5,000 bank branches nationwide, and over $2 trillion in assets—larger than the GDP of all but seven countries.

---

[5]     85 Fed. Reg. 20815 § (3)(a) ("Who is eligible to make PPP loans?", then listing the categories of lender eligible to make PPP loans).

[6]     *Id.* at 20813 § (2)(k).

[7]     *Id.* at 20816 § (3)(d); *see also* PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

25.     Chase, like other SBA-approved lenders participating in the PPP, serves as the intermediary and gatekeeper between putative borrowers and the SBA. No one can access the PPP without going through Chase or another approved lender.

26.     Chase's primary business is not, however, the processing of loans for a federal economic stimulus program. It operates in countless banking sectors, and has a diverse, sophisticated clientele—some of whom it favors with perks, attention, and privileges more than others, in order to maintain the substantial business (and occasionally prestige) they bring to the table.

27.     As one of the nation's largest banking institutions, Chase knew that it would receive tens of thousands of requests from putative PPP borrowers the minute that the window opened for applications. (And it did, in fact, receive such a crush of requests.) It also knew, or at least expected, that many of these requests would not be for extraordinarily large amounts of money, by Chase's standards (*i.e.*, less than $50,000). It also knew that the $349 billion allocated for the PPP would run dry before all meritorious applications could be processed—the scope of COVID-19's impact on small businesses was far too great to be covered by even such a large sum of money. (And the fund did, in fact, run dry very quickly.) Further, and importantly, Chase knew that many of its current, favored, and larger customers would also want to receive PPP loans, and would not appreciate having to wait in line with everyone else.

28.     As such, upon information and belief. Chase decided to dispense with the requirement that loan applications be processed on a first-come, first-served basis to the extent possible. Instead, it would make all efforts to prioritize processing the loan applications of its favored customers first, and deal with the remainder later, if they ever managed to make it through Defendant's failing website.

29.      According to the *New York Times*, that's exactly what happened.[8] For example, "At Chase, the nation's largest bank, nearly all private and commercial banking clients who applied for a small-business loan got one, whereas only one out of every 15 retail banking customers who sought loans was successful. ... The two-tiered system paid off for well-to-do customers: By the time the [PPP] ran out of money ... many top clients of national and regional banks had already had their loans approved."

30.      Many customers trying to access Chase's online PPP loan application portal on April 3 were, in fact, frustrated in their ability to apply. Again, per the *Times*: "At Chase, a portal accepting preliminary requests to apply was only sporadically accessible on April 3, the first day of the program. The best that customers could hope for was a call back from a Chase representative — days later — to proceed with the next steps." (This jibes with Plaintiff's experience, as discussed below, along with that of numerous other putative applicants who have turned to the Internet to voice their frustrations with Chase.)

31.      The result was to be expected, with the biggest clients of Chase and its parent company, JPMorgan, the victors: "At JPMorgan, nearly all of the 8,500 commercial and private banking clients who applied for a loan got one. That included companies like the sandwich chain Potbelly and the pharmaceutical company MannKind. At the same time, only 18,000 of more than 300,000 small-business banking customers who applied through Chase's retail bank, where they normally did business, got loans, according to the bank. In all, Chase handed out $14 billion

---

[8]      Emily Flitter & Stacy Cowley, *Banks Gave Richest Clients 'Concierge Treatment' for Pandemic Aid*, N.Y. TIMES, https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html (Apr. 22, 2020).

through the program — more than any other bank, but still less than half of the $36 billion that customers had sought."

32. To be sure, Chase's (and its clients') misconduct did not happen by accident: it was as part of a carefully executed plan by Chase. For example, upon information and belief, in the 24 hours prior to the April 3 window opening, leaders of Chase's retail bank hosted a nationwide conference call to provide workers with directions on how to handle customers, and to discourage branch employees from getting involved in customers' PPP loan applications. As a result, Chase's favored customers (as well as its parent company's favored customers) got the special treatment they desired.

33. Upon information and belief, Chase provided individualized support and service for a select group of PPP loan applicants that allowed them to "cut the line" and submit applications earlier than they otherwise would have been able to, but for Chase's intervention. Simultaneously, Chase discouraged and/or put stumbling blocks in front of otherwise qualified applicants who were not in Chase's orbit and favor. Consequently, qualified loan applicants (including Plaintiff) were not able to get in line for a PPP loan (via application) when they should have, delaying, diminishing, or losing their potential loan as a result.

34. The actual outcome of Chase-processed PPP loan applications supports this conclusion. (**_See_ Figures 1 and 2.**) Figure 1 depicts the PPP loans Chase processed between April 3, 2020 (when the window to apply for loans opened) and April 13. Figure 2 depicts loans processed between April 13 and April 16.

9

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

(**Figure 1**)

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791,761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

(**Figure 2**)

35.     The data shows that Chase processed loan applications for $150,000 or less at far faster clip during the final three days of the original PPP loan fund's solvency. Upon information and belief, this is because Chase's favored customers tended to request far larger loan amounts, and Chase prioritized those loan applications during the opening days of the application period.

## FACTS SPECIFIC TO AJIRA AI

36.     Plaintiff Ajira AI creates technology products for property and casualty insurance entities. The company is headquartered in Lisle, Illinois.

37.     Illinois Governor J.B. Pritzker reacted swiftly to the threat of COVID-19, announcing a disaster proclamation for the state on March 10, 2020. Statewide school closures, limits on public gatherings, and limits on the operations of both "essential" and non-essential businesses followed soon thereafter.

38.     Ajira AI's limited resources were stretched thin in the weeks since that announcement.

10

39.     The possibility of obtaining a PPP loan gave Ajira AI a ray of hope. And fortunately, Ajira AI already held a small-business account with a major SBA-approved lender at the time the program was enacted: Defendant Chase. Because Ajira AI was indisputably a putatively qualified PPP loan recipient under the SBA's regulations, given its size and plans to use the loan to primarily cover payroll costs and rent, so long as its application was submitted in a timely manner nothing should have stood in its way from obtaining the largest possible loan it needed.

40.     After the PPP loan application window opened, Ajira AI's application for a loan of less than $30,000 was submitted on April 7, 2020. An application number was assigned to the application that day. Ajira AI did not apply for a loan through any other bank.

41.      Ajira AI was sent an email on April 17, 2020 saying that PPP loan funds had been exhausted. Later, when it appeared that Congress intended to replenish the fund (which it eventually did), Chase sent an email on April 21, 2020 asking Ajira AI for clarification on its payroll documentation. This documentation was provided in great detail the same day, much of it coming from Ajira AI's third-party payroll processor Paychex.

42.     Unfortunately, Ajira AI's PPP loan application was rejected on April 23, 2020 due to Chase's purported (and incorrect) inability to verify Ajira AI's payroll documentation.

43.     Ajira AI had no idea that the reason they were stonewalled by Chase Bank, and prevented from receiving a PPP loan, was that Chase Bank had made the decision, internally, to prioritize the submission of PPP applications for its bigger and longstanding business clients over small businesses like, Ajira AI.

44.    Had Ajira AI been allowed to apply on a truly first-come, first-served basis with Chase, it would have received enough funds to keep paying its employees. Instead, the company was forced to lay off an employee due to not receiving a PPP loan.

45.    Instead, as a result of Defendants' actions, Ajira AI is now at a risk of having to lay off its employees and close its business—the very result Congress sought to avoid in creating a first-come, first-served loan program to be deployed by SBA banking partners with all deliberate speed. At minimum, Ajira AI lost out on tens of thousands of dollars in PPP loan funds it would have otherwise received, but for Defendants' misconduct.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class Action Allegations

46.    **Class Definition**: Plaintiff Ajira AI brings this action for itself and on behalf of a class of similarly situated individuals, defined as follows:

> All Chase Business Banking account holders that met the criteria for receiving a loan under the PPP, applied for, or attempted to apply for, a PPP loan through Chase, and whose application was not processed on a first-come, first-served basis.

Further, Ajira AI brings this action for itself and on behalf of the following sub-class:

> **Illinois Subclass**: All Chase Business Banking account holders in Illinois that met the criteria for receiving a loan under the PPP, applied for, or attempted to apply for, a PPP loan through Chase, and whose application was not processed on a first-come, first-served basis.

The following people are excluded from the Class and Subclass (collectively "the Class" unless otherwise indicated): (1) any Judge or Magistrate presiding over this action and members of their families; (2) Chase, Chase's subsidiaries, parents, successors, predecessors, and any entity in which the Chase or its parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file

a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Chase's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

47.     **Numerosity**: The exact number of members of the Class is not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Upon information and belief, hundreds of individuals fall into the definition of the Class.

48.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to, the following:

(a)     Whether Chase was required to process applications for PPP loans on a first-come, first-served basis;

(b)     Whether Chase processed applications for PPP loans on a first-come, first-served basis;

(c)     Whether Chase's web portal for submitting PPP loans was set up to intentionally discourage applicants;

(d)     Whether Chase had a policy and/or practice of prioritizing existing and large business customers to the detriment of other PPP loan applicants;

(e)     Whether Chase's conduct as alleged herein constitutes negligence;

(f)     Whether Chase's conduct as alleged herein constitutes fraudulent concealment; and

(g)     Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

49. **Typicality**: Plaintiff's claims are typical of those of members of the Class, as Plaintiff and other members sustained injuries arising out of the same wrongful conduct of Chase.

50. **Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Chase has no defenses unique to Plaintiff.

51. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(Individually and on Behalf of the Illinois Subclass as Against Defendant Chase)**

52. Plaintiff incorporates by reference the foregoing allegations.

53. Chase is the nation's largest banking entity and a major SBA-affiliated lender. As such, it owes a professional duty of care to those who use it to apply for SBA loans to process them in a manner consistent with the letter and spirit of the rules and regulations of the SBA loan programs. This is true both as to customers of its bank, such as Plaintiff, as well as non-customers seeking to become new customers.

14

54.     Chase was charged by the government with processing PPP loan applications on a first-come, first-served basis, pursuant to a CARES Act regulations explicitly and implicitly requiring this.

55.     Instead, Chase decided to process applications in a manner that would inherently result in their not being processed in the order they were received—or as close to it as was reasonably feasible—but would instead privilege, and create a "fast lane," for its favored commercial clients.

56.     Such conduct breached the duty of care owed to PPP loan applicants, including Plaintiff, to handle their loan application processing consistent with SBA regulations.

57.     As a direct and proximate result of Chase's professional negligence, Plaintiff and the Class have incurred damages in the form of a lost or reduced value PPP loans, as well as the lost time value of money Plaintiff and other members of the Class will likely incur future damages caused by Chase's negligence.

58.     As such, Chase is the direct and proximate cause of Plaintiff and the putative Class' injuries, and is liable to them for the full measure of damages allowed under applicable law, as well as interest, reasonable attorneys' fees, expenses, and costs.

## SECOND CAUSE OF ACTION
## FRAUDULENT CONCEALMENT
### (Individually and On Behalf of the Class as Against Defendant Chase)

59.     Plaintiff incorporates by reference the foregoing allegations.

60.     Defendant Chase understood prior to the formal launch of the PPP that it would receive many thousands of applications as businesses rushed to the nation's largest bank to obtain a loan. It also understood that the pot of money allocated by Congress to fund the PPP loans would be inadequate to satisfy demand. As such, it undertook to push its favored

15

commercial clients into a fast lane for loan processing, delaying the processing of others' loans and at times discouraging applicants (even its own customers, such as Plaintiff) from applying.

61.     Chase did not reveal this to the public. Instead, it promoted itself as an SBA-affiliated lender willing and able to process PPP loan applications.

62.     By participating in an SBA loan program while concealing that it would not adhere to one of the program's most critical features—that loans would be processed in the order applications were received—it injured Plaintiff and the Class, who lost out on loans (or were forced to accept smaller loans to the extent they could be obtained) they would have otherwise received.

63.     Thus, Chase's concealed materials facts about how it would conduct its processing of PPP loan applications where it otherwise had a duty to speak, as a major lender, SBA-affiliated lender, and—in Plaintiff and much of the Class' case—an existing business partner. Had Chase been open and honest about its plans, Plaintiff and the Class could have applied elsewhere for a loan, and sought to work with an institution willing to follow the SBA's dictates for administration of the PPP.

64.     Chase's conduct, and its concealment of these material facts where there was a duty to speak, proximately caused Plaintiff's and the Class' injuries.

65.     As a result, Defendant is liable to Plaintiff and the Class for the full measure of damages allowed under applicable law.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Individually and On Behalf of the Class Against Defendant Chase)

66.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

16

67.     The tort of tortious interference with prospective economic advantage has the following elements: (1) the plaintiff's reasonable expectation of entering into a valid business agreement; (2) the defendant's knowledge of the plaintiff's business expectancy; (3) the defendant's purposeful interference with the plaintiff's business expectancy; and (4) damages resulting from the defendant's interference. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484, 693 N.E.2d 358, 370 (1998). A valid contract is not required to state a claim for tortious interference with prospective economic advantage. *See Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 862, 893 N.E.2d 981, 993 (2008).

68.     Here, Plaintiff and the putative Class reasonably expected to enter into a valid business agreement to receive a loan from SBA—one that was critical to their survival during the COVID-19 pandemic.

69.     Defendant Chase was aware of the expectancy, to the extent it received a PPP loan application from Plaintiff and the putative Class or otherwise had direct and specific knowledge that they intended to apply for a PPP loan.

70.     Defendant Chase intentionally interfered in Plaintiff's and the putative Class' prospective business by allowing other PPP loan applicants to cut in front of them in the application line, and indeed, by systematically prioritizing larger and more prestigious commercial clients over Plaintiff and the putative class.

71.     As a proximate result of Chase's misconduct, Plaintiff and the putative class were not able to obtain PPP loans they otherwise were qualified to receive, or were only able to obtain much smaller loans elsewhere.

72.     As a result, Defendant Chase is liable to Plaintiff and the putative class for the full array of damages allowed under applicable law.

17

**FOURTH CAUSE OF ACTION**
**UNFAIR AND DECEPTIVE BUSINESS PRACTICES, 815 ILCS 505/1, *et seq.***
**(Individually and On Behalf of the Illinois Subclass as Against Defendant Chase)**

73.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

74.     The Illinois Consumer Fraud and Deceptive Business Practices Act provides, in
relevant part, that in Illinois it is illegal to engage in "[u]nfair methods of competition and unfair
or deceptive acts or practices, including but not limited to the use or employment of any
deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression
or omission of any material fact, with intent that others rely upon the concealment, suppression
or omission of such material fact[.]" 815 ILCS 505/2. "Any person who suffers actual damage as
a result of a violation of this Act committed by any other person may bring an action against
such person." 815 ILCS 505/10a(a).

75.     Here, Chase operates throughout the State of Illinois, including in its capacity as
an SBA-affiliated lending institution. In executing its role as an SBA lender involved in the PPP,
Chase concealed, suppressed, and omitted mention of the fact that it was not processing PPP loan
applications in the order in which they were received, and instead, was creating a "fast track" for
its favored, privileged commercial clients. This was despite the fact that the program was
designed to serve applicants on a first-come, first-served basis.

76.     Chase intended that businesses, like and including Plaintiff's and the putative
Illinois Subclass', rely on this concealed material fact, for two reasons. First, Chase wanted to
inhibit Plaintiff and the putative Illinois Subclass in obtaining PPP loans before their favored
clients did. Second, Chase still wanted Plaintiff's and the putative Illinois Subclass' business
(albeit not as much as its favored, privileged clients' business). Thus, Chase's concealment was a
win-win for the company: it could curry the favor of its privileged, favored commercial clients

by processing their PPP applications quickly and diligently, and then, to the extent the PPP fund had not yet run out, process everyone else's applications afterwards.

77.     Because of Chase's unfair conduct, and misleading and deceptive omissions and concealment, Plaintiff and the Illinois Subclass applied, or attempted to apply, for PPP loans through Chase under the impression that they would be processed on a first-come, first-served basis consistent with federal law. Had Chase been honest about its intentions, Plaintiff and the Illinois Subclass could and would have sought to apply for PPP loans elsewhere in the first instance and been able to submit a successful application before the PPP loan fund ran dry.

78.     As a result, Chase violated the Illinois Consumer Fraud and Deceptive Business Practices Act, and are liable to Plaintiff for damages caused by their deceptive conduct.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (Individually and On Behalf of the Class as Against Defendant Chase)

79.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.     To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25, 983 N.E.2d 1044, 1052 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)).

81.     Here, Chase has obtained and retained massive benefits to Plaintiff and the putative Subclass' detriment, in the form of origination fees obtained from clients allowed to cut in line to apply for PPP loans. It only obtained those fees by improperly and illegally prioritizing its favored, privileged commercial clients' applications over Plaintiff's and the putative Subclass'.

19

82.     Principles of justice equity, and good conscience demand that Chase not be allowed to retain these funds. Chase fell short in its duties as a lender, and an SBA-affiliated lender, during a crisis. What's more, Chase endeavored to use a crisis atmosphere and limited PPP funding to its advantage, shuffling its PPP loan applicants in a way most favorable to its goals of (a) ensuring the happiness of its favored clients, and (b) maximizing profits.

83.     The end result of Chase's conduct was that Plaintiff and the putative Subclass were unable to obtain the loans they desperately needed to keep their businesses afloat during the COVID-19 pandemic.

84.     As such, Chase must disgorge any and all origination fees it obtained from processing its favored clients' loans outside of Chase's normal PPP loan application process(es).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ajira AI LLC, individually and on behalf of the Class and Subclass, respectfully requests that the Court enter an Order providing for the following relief:

A.     Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as representative of the Class, and appoint its counsel as Class Counsel;

B.     Declare that Defendant Chase's actions, as set out above, constitute negligence, fraudulent concealment, tortious interference with prospective economic advantage, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and unjust enrichment;

C.     Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendant Chase's conduct, including without limitation actual damages for past, present, and future expenses arising from Defendant Chase's misconduct, lost time and interest, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class;

20

D.      Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

E.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.      Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**AJIRA AI LLC**, individually and on behalf of all others similarly situated,

Dated: July 29, 2020                    By:  __/s/ Kasif Khowaja_____
*One of Plaintiff's Attorneys*

Kasif Khowaja (#6315469)
THE KHOWAJA LAW FIRM, LLC
8 South Michigan Ave. Suite 2600
Chicago, Illinois 60603
Tel: 312-201-0575
kasif@khowajalaw.com

Matthew R. McCarley (*Pro Hac Vice Pending*)
Texas Bar No. 24041426
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel: 214.890.0711
Fax: 214.890.0712
mmccarley@fnlawfirm.com

*Counsel for Plaintiff and the Putative Class*